Case No. 17-1059, Oglala Sikhoi Tribe Petitioner v. U.S. Nuclear Regulatory Commission, et al. Mr. Parsons for the petitioner, Mr. Adler for the respondents, Mr. Pugley for the intervener. Thank you. Good morning, Your Honors. May it please the Court. My name is Jeff Parsons. I'm here on behalf of the Oglala Sioux Tribe. With me at council table is Travis Stills. From the tribe's perspective, this case is largely one about the interests of the tribe and its cultural resources on a property in its ancestral territory in the Black Hills. This property is recognized, although there has not been a scientifically defensible cultural resources survey done, it's recognized as exceptional for its high density of cultural resources at the site. We're talking about burials, sacred sites on this land, historic and prehistoric occupation sites, hundreds of these sites, hearths, and others. Those are listed, the ones that the NRC has identified anyway, are listed in the Joint Appendix at 655 to 659. The final effective license that the NRC has issued in this case allows the company to begin construction on those sites despite the fact I thought the 1A contention is still up for grabs, right? Isn't there going to be an evidentiary hearing and then a decision made and that would be reviewed by the commission? And isn't a possible outcome of that that the license would be revoked? Your Honor, the adjudicatory hearing has already taken place in this case. There was an adjudicatory hearing in 2014, a decision issued by the Atomic Safety and Licensing Board in April of 2015, so almost three years ago, and it found after an adjudicatory evidentiary hearing that the NRC staff, the NRC failed to comply with the National Environmental Policy Act with respect to surveys of cultural resources at the site. And so that evidentiary hearing is taking place. That was appealed up to the Nuclear Regulatory Commission. Pursuant to the regulatory commission's regulations at 10 CFR 2, 1210 C1, those ASLB, Atomic Safety and Licensing Board decisions are reviewable by the commission to make a final decision, which is what happened in December 23rd of 2016, almost 15 months ago. The commission's instruction was for the staff to essentially take another look. However, it left that license in full force in effect, affirmatively finalizing that. Right, but otherwise taking another look, isn't one possible outcome of that that the license would be revoked? I suppose that's a conceivable outcome, Your Honor. And did I misunderstand? Am I wrong? Is there not another evidentiary hearing yet to take place regarding what I keep calling the 1A issue? It is not entirely clear that there would be another evidentiary hearing. If the NRC staff goes back and completes its NEPA process, then that would potentially lead to another evidentiary hearing, but not necessarily. The problem the tribe has, of course, is that in the interim, and again, it's been three years since the Atomic Safety and Licensing Board issued its partial initial decision adjudicating the NEPA violation, and 15 months now since the NRC issued its final decision affirming those NEPA violations. Through this time, the company has this active, effective license, final license in place, and is steadily moving toward getting it started. It's had an effective license since 2014. It may not have been a lawful license, right? I mean, there were challenges to it, but it had an effective license when the staff issued it in 2014. That's true, Your Honor. And then that was adjudicated in the Atomic Safety and Licensing Board. The Atomic Safety and Licensing Board made amendments to that license through their decision, and then that was appealed by all parties up to the Nuclear Regulatory Commission, which issued its final decision. And so what that final decision, what that final order did, using the terminology of the Hobbs Act, which obviously controls, allows review of any final order for the granting of a license. And that's what we had on December 23, 2016, was the Nuclear Regulatory Commission issuing that final order, affirming that issuance of the license. If there's a possibility that further proceedings under 1A would lead to the revocation of the license, do we then have a final order in front of us? We do have a final order, Your Honor. The finality is addressed. In fact, if you look at the order itself at page 57, that's in the Joint Appendix at 0292, the Commission uses the words that this order should be considered final. And so that was a final order from the Nuclear Regulatory Commission. If you look at the case law that interprets finality from the Supreme Court Bennett v. Sphere, the Hawks case, the City of Benton case, and the Adinariwo cases from this district, excuse me, this circuit, the language they use is, with regard to finality, is whether the adjudication has reached a stage where judicial review will not disrupt the proceedings. So contrary to, I think, what the NRC is arguing in this case, there is no bright line just because there are additional steps and potential steps at the administrative level does not settle the issue. Even though those additional steps could overturn the decision to issue the license? Well, yes, Your Honor. I think what we get to is whether judicial review at this point will disrupt the proceedings. And, in fact, there have been no arguments to speak of from the other side with respect to how an adjudication review by this court would disrupt those proceedings. In the meantime, again, there's this final agency action in place that allows the company to go forward with construction that will put the tribe at risk of having its sacred sites desecrated or destroyed before they've even been identified out on the land. Can I pause over this? The second half of Bennett v. Spears requires that rights or obligations have been determined or that legal consequences will flow. So I understand an argument based on our immediate effectiveness cases. I'm not sure whether something beyond that fits within final order. That is, are you relying on our immediate effectiveness cases as providing the second element of Bennett? We did make that argument in our brief, Your Honor. I think that's a tenable basis for this court to rule. I also think that it is undisputed that rights have been determined. They haven't been determined. Imagine that there were no license at all at this stage. They had not approved the license. That was still pending, not an immediate license, any kind of license. Would you still be able to make the same argument? I don't think so, Your Honor. So it's only the fact that the license has become immediate effect. That's right. Turning to the language of the Hobbs Act, again, allows review of any final order for the granting, revoking, withdrawing, but granting of the license. And so, yes, it is the fact that we have a final agency action. What's the consequence of the license that was issued at this point? From the NRC's perspective, it is a fully effective license, allowing the company to go forward with construction at any time. Now, to be fair, there are additional permits that the company is still seeking. However, NRC has no control over that. We have no control over that. Essentially, from the tribe's perspective, the tribe is essentially being pushed to the edge of this cliff, where at any time these licenses could come down and will be forced. You mean these permits? I'm sorry, these permits from other agencies. Who issues the permits? There are other federal agencies, EPA and BLM. But not NRC? Say again? But not the nuclear regulatory? Correct. They're done with respect to the license itself unless they decide later to revoke it? That's right. And so at any time, these construction activities could begin. The NRC makes the argument that the tribe isn't – that it's sort of a harmless situation for the tribe because we could come in and ask for a stay within the NRC process in order to stop that activity from going forward. But from the tribe's perspective, that's very much an inadequate remedy. There was a request for the stay that the tribe made in this case immediately upon issuance of the license. And that decision discussion is at Joint Appendix 512 and 513. And the Atomic Safety Licensing Board recites the test for acquiring such a stay and calls it, as it is, an extraordinary remedy that's rarely granted in the NRC. And so the tribe is in a position where we litigated, were successful, won a ruling from the Atomic Safety Licensing Board, won a ruling from the Nuclear Regulatory Commission, finding violations of NEPA with respect to any survey of the cultural resources. And yet we're forced to come in and achieve an extraordinary remedy just in order to preserve the status quo to make sure that our cultural resources – again, we're talking burials, sacred sites – are not destroyed or put at risk from the immediate commencement of construction. So from our perspective – Why isn't the 2014 decision the one that triggers – that does the work here? In 10 CFR Section 2.1202A, it says, the NRC staff's action on the matter is effective upon issuance by the staff. Why isn't that when the license became immediately effective and not 2016 when this challenge was brought? Right. So it did become immediately effective upon issuance. So then why doesn't the clock start running? And then why aren't you too late to bring a challenge? Well, under the Hobbs Act, it's any final order for the granting of a license. The regulations – The Hobbs Act language is different than final decision, right? I mean, you're relying on the language of final decision. The Hobbs Act speaks differently. It talks about a final order. Right. And the way the NRC process works is that – the way they conduct it anyway is they – that when there's still issues to be reviewed by the agency, it's not a final order that can be changed. Not necessarily. There are exceptions. Again, the finality talks about – the finality cases talk about whether the proceedings have reached a stage where judicial review will not disrupt the proceedings. And so that, I think, is the finality issue. And, again, yes, the NRC is – NRC staff is conducting an additional administrative process, but, again, this license has been made final and effective. Can I ask you about the 2014 decision? The staff decided that there was no NEPA violation, right? That's right. So that is a different issue. If you would appeal that, you would be appealing whether there really was a NEPA violation, correct? Correct. Now, among other things, you're appealing the authority of the agency to go forward, notwithstanding its finding that there was a NEPA violation. That's correct. And that's a different – and you wouldn't have been able to make that argument in 2014. That's right. That was – that decision was made just months, three months or so, before the administrative adjugatory hearing was to take place. And so had we brought this case at that point, I think there would have been a tenable argument that that review by this court would disrupt the proceedings. We had yet to go into the adjudication before the Atomic Safety and Licensing Board to determine whether those NEPA violations occurred. And I think – so finality, I think, is established because we have the final license, determines rights and responsibilities. With regard to the vacatur issue, that's a very important one in this case. Under the APA, vacatur is the standard remedy. That's discussed in our brief – opening brief at 23. Standard remedy for who? For us? Sorry, yes. Under the Administrative Procedure Act. For the courts? For the courts, yes. And so what we have in this case is an established violation of the National Environmental Policy Act, and then a license affirmed through a final order of the Nuclear Regulatory Commission. What they argue is that we're not harmed because of something called the programmatic agreement. Again, they say we can come in for that stay, which, as I explained, is not an adequate remedy. They say that we're protected under the programmatic agreement. But the programmatic agreement is purely a creature of the National Historic Preservation Act. It only applies and only protects cultural resources that rise to the high level of being eligible for the National Register of Historic Places. And, in fact, the joint – I take it it doesn't address the NEPA question. It does not at all address the NEPA question, and it leaves a whole raft of cultural resources without the ability for us to protect. In fact, at Joint Appendix 920, 923, and 925, the PA by its own terms said, if not eligible for the National Register of Historic Places, no further consideration will be given to those cultural resources. And so it is a very narrow, a slim reed, so to speak, of protection for any of the tribe's cultural resources, which, again, are at risk because this final agency action and this final license are in place despite the lack of any cultural resources survey. Questions? Judge Henderson? No, no questions. Okay, thank you. We'll hear from the Governor. May it please the Court, my name is James Ather, I represent the U.S. Nuclear Regulatory Commission in the United States of America. This case should be dismissed for lack of jurisdiction. This Court has said that finality under the Hobbs Act is to be narrowly construed, and also that a final order typically disposes of all issues as to all parties. Here, the NRC proceeding is still ongoing, and the tribe is still participating. So the Supreme Court of the United States has said finality is pragmatic. That's what it said in Bennett. And we have said both in Massachusetts, Commonwealth of Massachusetts, and short of waiting, that where there is an immediate effectiveness, that can be a final decision under the Hobbs Act. Yes, Your Honor. You have to start with those cases to get to the hardest point for you. Yes, Your Honor. We don't think that this case fits that mold. It's certainly possible that the license is effective, that one could, but we don't think this one does. First, as has been noted, the license was issued in 2014. But it is the case that in 2014, no one had decided that there was a NEPA violation. That's correct. Let me put all my cards on the table so you can get the hypothetical. Commissioner Barron's dissent essentially says NEPA requires that the EIS be lawfully completed before a license can be issued. And he's saying that in this case, and maybe in all cases, the NRC is taking the position that it can go forward even if NEPA is violated, unless the petitioner can show immediate and irreparable harm. So if you wanted to challenge that, imagine the NRC announced, I don't care what NEPA says, we don't care what NEPA says, we're going to let every license go forward unless the petitioner can show irreparable injury. Are you saying that could not be challenged until a final decision, until they ultimately resolve on remand and fix the problem? Well, one, that was, of course, not what was said here. Well, what was said here, I'm not sure about that. What was said here is that NEPA was violated, right, and we're going to remand it to get it fixed, right? Correct. Okay. But in the meantime, a license goes forward. Yes, Your Honor. I think it's an important distinction that this hearing process going on, it's not a NEPA process. It's under the Atomic Energy Act. I'm not asking about the hearing process. I'm going to give you that for the purposes of this argument. Okay. I'm asking for NEPA alone. Under NEPA, you can't just go forward without completing an appropriate EIS. In this case, they're going forward without an appropriate EIS. There is an immediately effective license. Now, maybe this is disputable. Maybe there's a law argument about it. But your interpretation of final agency action means that this could never be tested because by the time it then gets up to us, you will have resolved the question of whether NEPA has been violated, whether it can be fixed or not, and then you will either vacate the license or you'll give the license, in which case it will be over. So aren't you not effectively insulating the agency from violating NEPA by your interpretation of final agency action? Well, we don't believe so, Your Honor. Do you want to tell me why? Well, first, as has been mentioned, if there is some immediate time-sensitive issue, that's what our state processes before, and as we suggested in our brief, we think that falls into the immediate effectiveness type box that can then be taken straight to court. And so a court can look at that question just as it did in the immediate effectiveness issue. But the question of a stay under your rules, and I'm just going to read from your own brief, is, stay was available where the decision, quote, threatens the party adversely affected by it with immediate and serious irreparable impact. That is not the NEPA statement. What if a defendant said, what if you announced, we are going to violate NEPA as long as there is not, the party is not adversely affected, as long as the party can't prove that it was adversely affected by immediate and serious irreparable impact. That strikes me as a clear violation of NEPA, that rule. And yet the only way somebody can appeal to get a stay under your rule is by taking the burden on itself and by showing immediate and serious irreparable impact. I think one point that needs to be, and the reason I was bringing up the hearing process earlier, is that because the violation was identified a year after the license was issued, there's nothing in NEPA that tells agencies what do you do if a year after you take a major federal action and you're looking back at your AIS and you decide, hmm, we've done something, there's something in there that needed to be better to comply with NEPA. There's nothing in NEPA that says what to do. There's nothing in our Atomic Energy Act hearing process, which says very little about the specifics of hearings, that tells us what to do. So the board was in a situation when it made this ruling deciding, okay, well there's no statute that tells me exactly what to do here, what do we do? And it looked at the fairness of the situation as well as the... I think there's an argument about that, but that's on the merits. Right now I'm only on the question of jurisdiction. Sure. And on the jurisdiction question, imagine that is what you did in this case. Maybe it's right and maybe it's wrong. You're telling me it's untestable, that somebody can't dispute the board's conclusion. So the commission concludes that there's going to be an internal harmless error rule, right? That's what they've essentially done. Inside the agency, harmless error rule. What if that's unlawful under NEPA? That's the nature of their challenge. You're telling me that that can't be challenged. The agency can adopt any internal rule, not only on the merits, but it can't be challenged. I think the issue would be that in this circumstance, based on this record, it seems like it would be an academic issue. If it becomes non-academic, the state process is available and the court can review whether the NRC abuse its discretion in doing this. But at this point, if it is an academic question, this is basically a temporary situation that is on track to getting resolved, what is the issue the court needs to jump in and remedy? Normally, for example, if an agency issues a rule without notice and comment, agencies often argue, well, this is just academic, because we really took everything into consideration, and we don't have to follow the APA. Don't follow it. We normally say, yes, you do, because there's a value in getting notice and comment, which the party can't even prove until there's been notice and comment. Here the argument is, there is a value which NEPA establishes as a congressional principle that you have to first do the hard look before you do the federal action. And you've done the federal action before you finish the hard look. I don't know, maybe that's right, maybe that's wrong, but it seems to me that that's a final decision on your part that is subject to immediate review, because it's immediately effective. There would be a path after the 2014 license issuance, if there were some non-academic concern that the tribe could raise, that the license is actually going to affect us, which it hasn't, and I think it's based on the fact that the Power Tech project isn't going anywhere right now because of other permits they need. But they have that ability. Well, let me ask that. If that's true, if nothing's going to happen, why don't you just suspend the license until they get the other permits? You suspend the license pending the resolution of the NEPA issue and whatever else. If you don't think there's any harm to them, the reason you think there's no harm to them is because nothing's happening, then why not suspend the license until you're finished with your procedures? Well, I'm sure that could have been a possible outcome. The board explained why it did what it did, but it acknowledged it could have suspended the license. I mean, that issue of the project not moving forward at the time wasn't something the board pointed out. I mean, there was only a year after license issuance. Now we're four years after. What was the argument in favor of continuing the license? The argument was that in the board's view on this NEPA and NHPA issue, which was very particular to the tribe's own interests, that the tribe was partly responsible for the information not being developed to the point where the board thought it needed to be. I thought it couldn't resolve. I thought the commission said it wasn't going to resolve that question. The question of who was responsible, I thought, was not resolved. Isn't that right? Well, that was the board's rationale. I don't think it was challenged to the commission on appeal. The argument the tribe made to the commission on appeal was that the board doesn't have legal authority to even make decisions like that. I thought that went more to the dispute over consultation and not so much to dispute over the adequacy of the survey. I think they're very linked. The survey process is how I think the staff would ordinarily gather information to discuss in the EIS. NHPA and NEPA are often melded together. I think in this case there was official linkage of the two and then some separation. There was an EIS done here, right? Yes. The NEPA process went from start to a sensible finish, and then the license was issued. The commission's concern was that there were procedural inadequacies with the EIS, right? I think the commission's, well, in response to the tribe's argument that as a matter of law, upon the board's findings on contentions 1A and 1B that license must be vacated, the commission said, well, no, let's step back. That's not true. We have procedural statutes here, so there is some flexibility. The tribe really hadn't argued anything other than that, so that's what the commission responded to. Is it not the case that the commission accepted the board's view that NEPA had not been satisfactorily complied with? Isn't that right? It declined to disturb it, yes. Okay. Then in that case, didn't the board conclude that the requisite hard look hadn't been given? Yes, that is correct. Again, a year after license issuance. Right. The license was issued, and then they figured out that they had not given appropriate hard look as required by NEPA. Correct, and so now the NRC staff is busy trying to rectify that, and we'll see what the board thinks. And in the meanwhile, the license is out there. That's correct. Judge Henderson? I'm okay. Okay, thank you. Thank you, Judge. I think we have an intervener for four minutes. Is that right? Good morning, Your Honors. May it please the Court. My name is Christopher Pugsley, and I am appearing on behalf of the intervener respondent, Powertech USA, Incorporated, who serves as the NRC licensee in this proceeding. While Powertech concurs with NRC's arguments regarding jurisdiction, should this court see fit to exercise jurisdiction over petitioner's appeal, Powertech believes it's important for the court to take notice of some issues associated with the items, the other items on appeal before the court. First, with respect to vacator of the license, we've had the record is rife with references to immediate and irreparable harm. We've already heard multiple questions during this argument about it, and there have been references to, quote, the Powertech project isn't going anywhere anytime soon. Well, I think as the licensee, it's my obligation to inform the court as to where those permit proceedings currently stand. Does any of that in the record? We have noted in several submissions to the NRC staff, Your Honor, that where the proceedings stand because that status has been requested by the licensing board, but it's not in the record before you. If you would like to hear where we are. We should kind of restrict ourselves to the record. Normally, we only decide on the record. Of course, Your Honor. Well, with respect to a discussion regarding Commissioner Barron's dissent in CLI 16-20, I would also like to note for the record here, we're talking about a NEPA violation, and part of the way the commission has exercised its inherent supervisory authority over the issuance of Atomic Energy Act licenses, then-Commissioner, now-Chairman Svinicki noted in a dissent that with regard to the NEPA violation associated with the tribe's historic and cultural resources, that the information was not reasonably available to NRC staff due to the conduct of the process associated with identification of those resources and further assessment. So that could have been a ground for the commission's decision, right? Is that what you're saying? I'm sorry, Your Honor? That could have been a ground for the commission to decide that there was no NEPA violation. Yes, Your Honor, that's correct. But it wasn't the ground. That was not the ground. That was concluded. So you're familiar with the Chenery case, which says we can only uphold on a ground actually decided by the commission. If we were to remand, they could decide on that ground if they wanted to, but they didn't, and neither did the board in the end. No, Your Honor. The board decided there was a NEPA violation, and the commission declined to disturb, even though contention 1B has been resolved at the board level, but it's still ongoing. 1B is the cultural. The National Historic Preservation Act process, yes, sir. Not the NEPA one yet. No. So the cultural one, the Historic Preservation Act, has been resolved, and it will go back up to the commission? It could conceivably go back up to the commission, yes. And can they bring it up piecemeal to the commission, or do you have to wait until the NEPA decision is made? Well, Your Honor, it is possible for interlocutory review, although it is disfavored by the commission under the rules of practice, but it is possible. I can speak that Powertec did file an interlocutory appeal on contention 1A, so that is possible. But it could come up together. I would conceive it could come up together at the end of the board proceeding, because in the commission's CLI 1620, they affirmed the board's retaining of jurisdiction over 1A and 1B. The board expressly noted that in its decision, that they were retaining jurisdiction. So that could have conceivably been grounds for denial of the petition for review in that case. And the board's decision is supposed to conclude by October, is that right, on the NEPA issue? On contention 1A, Your Honor? Yes. Currently, that's what the board is proposing in terms of a schedule. There are ongoing discussions between all parties to the proceeding as to a proper approach to settling the contention. With the board. And then the process takes on a life of its own in terms of how long the agency takes to go through the steps of supplementing the supplemental EIS, and then issuing it for public comment, and then answering those comments as required, and then issuing the final document. But at the same time, it is conceivable that there would be no resolution to the case, that contention, that is, until all parties agree that the product produced by NRC staff is adequate to satisfy the petitioner, and we have another party in the group, Consolidated Intervenors, they are free to revise or amend their contention associated with this, with the board, if they find the product unsatisfactory. I see my time is up, Your Honors. May I please sum up? Yes, please. Well, then it's a Powertech respectfully request that this court agree with NRC staff's position and deny the prayer for relief offered by petitioners. Thank you very much. How much time is left? Just for that, there's not a minute, but the request is three minutes. All right, we'll give you three minutes. Before I read, can I ask you to come back up again? I'm not sure what we can do with something not in the record, but maybe just for my own curiosity. Of course, sir. So I'm going to put this to the side. I haven't yet decided whether we can consider this, but go ahead. Tell me what is the disruption that would be caused if you didn't have the license now? If the license were suspended or revoked? If they had suspended the license, yes. The harm to the company, while it was stated earlier by the agency that the project isn't being developed at any time right now, and we're not allowed to because we don't have the other permits, the harm to the company is primarily financial. Powertech is a publicly traded company. It has an obligation to its shareholders, and it's what we refer to in this market, and I'm not sure about other markets, Your Honor, but a junior company. Essentially, it's defined as a company that has no cash flow and is burning investment capital every month that it's in operation. And if the license were suspended, vacated, or revoked, the stock price of the company would plummet, and the company would either not be able to maintain operation or would be subject to, I guess, what you could call a hostile takeover. And what if you had a license, but you weren't able to do anything with it until this were resolved? If we had a license? Yeah, I don't understand. I get your general point about the financing, but if you weren't allowed to do construction, for example, does this license include the ability to do construction? Your Honor, that's actually a two-tiered argument. One is that NRC has a regulation at 10 CFR Part 40.32E that defines construction and the items you are not allowed to engage in prior to issuance of a license. That would be essentially constructing the project. That's a separate. That's a separate. So I'm just going to read. It says if license is hereby issued authorizing the licensee to receive, acquire, possess, and transfer by-product, source, and special nuclear material, to use such material for the purposes designated below to deliver or transfer such material to persons authorized to receive it in accordance with the regulations of the applicable parts. And that's what your current license is, right, the materials license? That's correct. But, Your Honor, there is one other item to note, is that NRC also requires as a standard requirement in these types of licenses that we must obtain all other necessary permits or approvals prior to proceeding with operation of a site. Now, the South Dakota Board of Minerals and Environment that holds hearings on what are called large-scale mine permits, they, of their own initio sua sponte, stopped the proceeding and basically said that they were waiting for NRC and EPA to conclude its review processes. And NRC's review process, to the best of my knowledge, Your Honor, is everything. So, again, I ask, if that's the case, why would it matter if the NRC also didn't? In other words, you're telling me you're stymied anyway. Why didn't that cause all your investors to leave? And if it didn't, why would further action by the NRC along the same lines make a difference? Well, further action along the same lines by NRC in this instance is a huge financial problem, as I said before. And you obviously know that. But what I'm not seeing is I didn't realize that the state, what state, South Dakota? South Dakota, sir. South Dakota's already stopped these kinds of operations, that is, the kinds permitted by the material license. Well, they haven't stopped the operations, sir. They've stopped the hearing proceeding. But you can't go forward without their permit, right? Yes, sir. We cannot go forward without their permit. So if they, if the commission were to not let you go forward until you got that permit, you wouldn't be in any worse position than you are now. Well, the commission already doesn't allow us to operate the facility without all the permits. No, I'm trying to figure out what license you've been granted, which I think I have in front of me. It's the materials license, right? Yes, sir. Okay. And you're not doing any of the things in that license that the license authorizes you to do because, among other things, South Dakota won't let you. Is that fair? That's correct. We cannot construct the site and or operate it until we get all the relevant permits and approvals. So what would be the difference? If that's true, why would it matter? And South Dakota is not letting you do that until you finish the NRC process, right? That's what you just said. South Dakota is not continuing their administrative hearing process until, yes. Right. So what is the harm to you if the NRC also said, we're not going to let this materials license have immediate effect until we finish our process? Since South Dakota is already holding you up. Well, the harm to us is, again, Your Honor, I'm sorry to keep beating a dead horse, but it is financial, and the fact that having an effective license in place further moves the process forward with the Environmental Protection Agency with respect to underground injection control permits and aquifer exemptions, which would then lead to a recommencement of the South Dakota proceedings. The longer this gets pushed into the future, the longer it strains out a company that has no cash flow, and the longer that they go burning investment capital, the less likely it is the company can remain viable. And absent a showing of really, to tell you the truth, sir, any harm to the petitioner, which there is none because we're not empowered to do anything at this site right now, absent that showing, why stay the license? This is like a chicken and egg problem, right? You can't do anything, they can't do anything. Once you start doing anything, it's too late for them. Once they stop you, it's too late for you. All right, but I think this was a useful intervention. I appreciate it. Thank you, sir. I appreciate the extra time. Any further questions? Okay, thank you. Thank you, sir. Now I'm sorry, now we'll hear you from O'Connell. Thank you, Your Honor. Very briefly, two things. With respect to the company's statements about their concern on their finances with respect to not having an effective license, from the tribe's perspective, there is no reasonable expectation that they should be able to keep a license in effect where it's been adjudicated to be in violation of the National Environmental Policy Act. An illegal license, there's no expectation that they should be able to retain in full force and effect what is in effect an illegal license. With respect to the issues with South Dakota and such, there is some evidence in the record that gets to this issue that I think is worth the Court taking a look at. It's at JA0849 and JA0850. It's a letter from the power tech company to the state of South Dakota, and it discusses the issue of the stay that's been put on the proceedings in South Dakota for those permits. And the record reflects that the company says the hearing, meaning the South Dakota hearings, were suspended pending acquisition of the required federal permits and will be resumed once EPA and BLM issue their permits. It's anticipated that the permit hearing will be resumed shortly thereafter. So the concern the tribe has is that the stay in the South Dakota case is based on the acquisition of those permits, well, or licenses. Do we have that, what you just read? Do I have it here? Do we have it? Yes, I'm sorry, Your Honor. It's at Joint Appendix 0849 and 0850. And so while the characterization, I think, was that somehow all of these issues need to be wrapped up, and I think you heard that there is no concrete plan, it could go on for really quite some time, yet Power Tech holds an active and effective license. And according to the record, it demonstrates that the hearing was suspended pending acquisition of the required federal permits. Well, guess what? They have their NRC permit. And so the fact that there are additional proceedings, attempts by the NRC staff to remedy the NEPA violations, does nothing to wipe that fact off the board, that they do indeed have their NRC permit in hand. And from our perspective, and based on the record, that is sufficient for them to go forward with the South Dakota process once they get their other federal permits in line. That is to say that the NRC process, for purposes of the South Dakota stay, is complete. And if there are any other questions. Thank you. Just one second. Sure. Okay, Judge Henderson, any questions? No. That's good. All right, thank you. We'll take the matter under submission. We appreciate it.
judges: Garland, Henderson, Griffith